NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250057-U

NO. 4-25-0057

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 11, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Pike County |
| AUSTIN L. RODHOUSE, | ) | No. 24CF58 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles H.W. Burch, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Presiding Justice Steigmann and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding (1) defendant did not receive ineffective assistance of counsel where his attorney failed to object to evidence of defendant's prior bad acts, elicited some such evidence herself, and requested an inapplicable jury instruction on such evidence; (2) defendant did not receive ineffective assistance of counsel where his attorney failed to request a jury instruction warning the jury to treat testimony from a criminal accomplice with caution; (3) the State proved beyond a reasonable doubt that the acts underlying defendant's convictions for predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2024)) were committed for the purpose of sexual gratification of defendant or the victims, and the trial court did not err in omitting the "sexual gratification" requirement from the verdict form; (4) separate physical acts supported defendant's convictions for predatory criminal sexual assault of a child and his convictions for indecent solicitation of an adult (*id.* § 11-6.5(a)(2)(i)), and therefore defendant's convictions did not violate the one-act, one-crime rule; and (5) defendant's posttrial counsel did not suffer from an actual conflict of interest in failing to argue that her office provided ineffective assistance of counsel by failing to comply with Illinois Supreme Court Rule 415(c) (eff. Oct. 23, 2020) before trial.

¶ 2    A Pike County jury found defendant, Austin L. Rodhouse, guilty of 19 felonies,

including three counts of aggravated domestic battery, a Class 2 felony (720 ILCS 5/12-3.3(a), (a-

5) (b) (West 2022)); 720 ILCS 5/12-3.3(a) (West 2024)); one count of criminal sexual assault, a Class 1 felony (720 ILCS 5/11-1.20(a)(1), (b)(1) (West 2024)); four counts of predatory criminal sexual assault of a child, a Class X felony (*id.* § 11-1.40(a)(1), (b)(1)); three counts of indecent solicitation of an adult, a Class 2 felony (*id.* § 11-6.5(a)(2)(i), (b)(3)); two counts of child pornography, a Class X felony (*id.* § 11-20.1(a)(5)(i), (c-5)); three counts of aggravated battery, a Class 1 felony (*id.* § 12-3.05(a), (h); 720 ILCS 5/12-3.05(b)(2), (h) (West 2022)); and three counts of aggravated criminal sexual assault, a Class X felony (720 ILCS 5/11-1.30(a)(2), (d)(1) (West 2024)). The trial court sentenced him to life in prison.

¶ 3        Defendant appeals. First, he claims that his trial counsel was ineffective in failing to object to evidence that he committed criminal acts other than the offenses for which he was on trial and those disclosed in the State's pretrial motions, in eliciting testimony of such crimes herself, and in requesting an inapplicable jury instruction on his prior criminal acts. Second, defendant claims his attorney was ineffective in failing to request a jury instruction on the limits of testimony from an accomplice in a criminal case. Third, defendant argues the State failed to prove that the acts underlying his predatory criminal sexual assault of a child convictions were performed for the purpose of sexual gratification and that this element of the offense was improperly omitted from the verdict forms. Fourth, defendant claims his convictions for indecent solicitation of an adult resulted from the same acts as his convictions for predatory criminal sexual assault of a child and should be vacated for violating the one-act, one-crime rule. Finally, defendant claims that his posttrial counsel suffered from an actual conflict of interest because she failed to zealously argue her own office's ineffectiveness in a posttrial motion.

¶ 4        We affirm.

¶ 5                                I. BACKGROUND

- 2 -

¶ 6        In May 2024, the State charged defendant with one count of aggravated domestic battery, alleging that defendant kicked his partner, C.M.C., in the abdomen, rupturing her spleen. Later, the State charged defendant with an additional 47 counts. In addition to the count of aggravated domestic battery, the State ultimately proceeded to trial on 18 other counts. Count 2 alleged defendant committed criminal sexual assault in having sexual intercourse with C.M.C. on May 4, 2024, with the use or threat of force and without C.M.C.'s consent. Counts 4, 5, and 6 alleged defendant committed predatory criminal sexual assault of a child in that, on or about May 1, 2024, he or someone "for whose conduct he is legally responsible" committed acts of contact between the sex organ of C.M.C. and the sex organs or hand of the minor children R.L.R. and R.M.R., for the purpose of sexual gratification. Count 10 alleged defendant committed predatory criminal sexual assault of a child by touching R.M.R.'s sex organ with his hand on or about May 1, 2024, for the purpose of sexual gratification. Counts 14, 15, and 16 alleged defendant committed indecent solicitation of an adult in arranging for C.M.C. to commit acts of sexual conduct with R.L.R. and R.M.R. on or about May 1, 2024. Counts 17 and 18 alleged defendant committed child pornography in arranging for R.L.R. to appear in a video and photographs depicting R.L.R.'s sex organ and hand touching C.M.C.'s sex organ on or about May 1, 2024. Counts 25 and 26 alleged defendant committed aggravated battery in shocking R.L.R. and R.M.R. with an electric cattle prod between June 1 and August 31, 2023. Count 27 alleged defendant committed aggravated domestic battery in strangling C.M.C. between June 1 and August 31, 2023. Count 33 alleged defendant committed aggravated domestic battery by tattooing " 'cum whore' " on C.M.C.'s buttocks in January 2024. Count 41 alleged defendant committed aggravated battery in using a vise to break C.M.C.'s finger in March 2024. Counts 45, 46, and 47 alleged defendant committed aggravated criminal sexual assault in using force to insert a butt plug and his hand into C.M.C.'s

- 3 -

anus, causing bodily harm, from January to April 2024.

¶ 7        At a pretrial hearing, defense counsel commented that he had taken some of the discovery material to the jail for defendant to review. The State observed that defense counsel had not filed a motion to allow defendant to view this material, which had not been redacted. The trial court told defense counsel to file a motion and to review the material with defendant. Defense counsel told the court, "There's thousands of pages here. I'm not going to sit and neither is [co-counsel] going to sit and waste valuable time that could be spent" "preparing his defense while he reads a bunch of trash." Later, defense counsel added, "The appellate court can deal with it on an ineffective assistance of counsel when it gets there."

¶ 8        Before trial, the State filed two motions *in limine* pursuant to sections 115-7.3 and 115-7.4 of the Code of Criminal Procedure of 1963. 725 ILCS 5/115-7.3, 115-7.4 (West 2024). The State sought an order allowing it to admit testimony from 10 women who alleged that defendant had sexually abused them in the past. Multiple women alleged that defendant had committed this sexual abuse when they were children. The State also sought permission to introduce evidence that defendant had committed far more domestic violence offenses than those charged. The State argued these uncharged offenses established defendant's "propensity to commit acts of sexual conduct" and his "propensity to commit acts of domestic violence."

¶ 9        The trial court issued orders allowing the State to introduce much of the proposed evidence. It found that the State's proposed evidence established defendant's propensity for sexual conduct and domestic violence. The court also stated that section 115-7.3 and 115-7.4 allowed the introduction of other criminal acts to show this propensity "beyond the previously created exceptions, such as motive, intent, and lack of accident." Based on the details in the alleged other sexual assaults, the court found evidence that defendant had no regard for the age of consent; that

he had a "fetish for engaging in anal sex," including without consent; and that he "used alcohol as means to take advantage of women." Based on the details of the alleged domestic violence, the court found

> "that evidence of physical abuse, verbal abuse, manipulation and control tactics that were similar with every woman as well as the sexual abuse are all intrinsically intertwined in understanding the full story of how the defendant got to this level of abuse against C.M.C. for which he has now been charged."

¶ 10 At trial, Officer Jordan Gerard, special agent with the Illinois State Police, testified that he and his partner, Officer Ereka Glass, began investigating defendant and C.M.C. on May 8, 2024, after he received a call from an investigator with the Illinois Department of Children and Family Services. They went to Blessing Hospital in Quincy, Illinois, and spoke to C.M.C., who appeared afraid and in pain. At first, C.M.C. explained her injuries by telling them that she had fallen in a bathtub. Officer Gerard told her that, after speaking with her doctor, neither the officers nor the doctors believed that to be true. Officer Glass told her she was safe and they knew she was being blackmailed. C.M.C. then told them that defendant had kicked her and she was being blackmailed with a video of her having "mommy time."

¶ 11 According to Officer Gerard, C.M.C. said that she and defendant often communicated on Snapchat or instant messaging. The officer took possession of her phone, with her permission. He told other officers to arrest defendant and secure his phone. Defendant's two cell phones were admitted into evidence. Officer Gerard also received digital records from Snapchat. He admitted that Snapchat records indicate what device a message came from, but they do not indicate who wrote the message. Officer Gerard testified that on C.M.C.'s phone, he found "thousands of nude images" taken "on a daily basis." In one image, C.M.C. was on a couch with

a young boy. She was naked from the waist down. Officer Gerard testified that both of C.M.C.'s hands were visible in the picture, indicating someone else took the photograph. Another picture showed the boy's hand near her genitals.

¶ 12 Police later executed a search warrant on C.M.C.'s and defendant's home. Photographs that Officer Gerard took during the search were shown to the jury, including pictures of a rope tied to the rafters, a steel brand with an "R," a plastic tube attached to a bag, a vise, a piece of steel with a rubber handle, and a broken cattle prod.

¶ 13 The record on appeal does not include a transcript of the third day of trial. Based on the trial court's docket entries, it appears that an Illinois State Police criminal intelligence analyst, Jared Sample, testified, and numerous photographs and text message conversations were admitted into evidence.

¶ 14 Dr. Robert Thomas, an emergency room physician at Illini Community Hospital, testified that C.M.C. and defendant came to his hospital in May 2024. C.M.C. said her back hurt and she fell in the bathtub. Dr. Thomas examined C.M.C. and found "sores throughout her body." She was also "covered in tattoos." He observed "various bruises in just random locations," with "variable ages of healing." He testified that C.M.C. had a ruptured spleen, which was "a fairly uncommon injury without trauma."

¶ 15 Dr. Pierre Charles, a trauma surgeon, testified that he treated C.M.C. at Blessing Hospital. He was asked if he saw any old injuries on C.M.C.'s X-rays. He answered that "[i]n retrospect," he found a rib fracture, but it had a callus, indicating it was an "old" injury, and the fracture occurred before the spleen rupture. He saw her body during the surgery on her spleen, and he was "concerned" by her many tattoos and their "explicit vulgarity." When Dr. Charles put a camera in C.M.C.'s abdomen, he found around one liter of old blood. Dr. Eric Fynn Thompson

testified he treated C.M.C. on May 13, 2024, for a fracture to her right-hand ring finger. He testified it "was probably not a new injury." Dr. Stephen Liesen, a dentist, testified that he examined C.M.C. in May 2024. X-rays revealed a bone fracture in her lower jaw that had "callused over."

¶ 16　　　　Officer Glass testified she met with C.M.C. at the hospital in May 2024. At first, C.M.C. said that she had fallen in the tub. After Officer Glass assured her she could trust her and Officer Gerard, C.M.C. told them "what, according to her, had actually happened." The State showed the jury a PowerPoint presentation with messages sent between defendant's and C.M.C.'s cell phones. Officer Glass read extensively from the messages. In some messages, defendant recommended C.M.C. have sex with her son, R.L.R., so that R.L.R. could impregnate her. Other messages contained graphic discussions of the pain C.M.C. experienced trying to insert a " 'double' " dildo in her anus. Defendant sent messages demanding that C.M.C. cut herself, including cutting her vagina and on or near her areola. A video showing C.M.C. cutting herself was shown to the jury.

¶ 17　　　　Before C.M.C. took the stand, the State reported that it had notified C.M.C.'s attorney that any truthful information she shared with the State concerning the abuse of her two children would not be used against her in any criminal prosecution.

¶ 18　　　　C.M.C. testified she met defendant in the spring of 2018 on the dating application Tinder. Soon after they met, she moved in with him. C.M.C. gave birth to her and defendant's first child, R.L.R., in October 2019, and their second child, R.M.R., in December 2020.

¶ 19　　　　C.M.C. described the cause of her injury in May 2024. She explained that the night before she was injured, defendant became upset with her because she had not journalled about her bath with the children. Defendant told C.M.C. that he wanted her to put weights onto piercings she had in her genitals and stand in front of the air conditioner in the living room for two hours.

Defendant was in the bedroom, where he could watch C.M.C. using a camera installed in the living room. If C.M.C. sat down during that time, he would hit her with a metal "chopstick." C.M.C. explained that, at one point, defendant covered her with blue and green dye. Defendant went to sleep, but he told C.M.C. to stay awake and journal. In the morning, defendant told C.M.C. to eat dog food off the floor. She was on the floor eating the dog food when defendant kicked her side and left for work. She locked the door to the home and then passed out onto the floor.

¶ 20        C.M.C. awoke to defendant yelling in her face. He sat her on a chair, crushed Adderall, and tried to make her "snort" it. C.M.C. explained that her "vision completely went black" and she could barely hear. R.L.R. and R.M.R. were home with C.M.C. when this happened. Defendant brought C.M.C. to a hospital in Louisiana, Missouri. During the drive, he told her to tell the doctors that she had fallen in the bathtub. Once they were back home, she had trouble walking and her breathing was labored, so she decided to go to bed. Defendant told her he wanted to have sex. C.M.C. told him that she could not breathe or move and it was not a good idea. She told him that she did not want to have sex, but he had sex with her anyway. During intercourse, her breathing became worse, and she began gasping for air. She testified that if she had tried to fight back, "he would probably come back and beat me." The State asked, "Was there a rule about whether you could say no?" She answered, "Yes," explaining, "[T]hat's not a word."

¶ 21        C.M.C. testified that her condition worsened, and on May 7, 2024, she went to see her physician and then went to the hospital. She learned that her spleen was ruptured. After surgery on her spleen, C.M.C. went to a private hospital room, and police officers took defendant away. Later, she talked to Officer Gerard and Officer Glass. Eventually, C.M.C. told them that defendant was blackmailing her with a video showing her sucking R.L.R.'s penis. Defendant told her that he would turn the video in and she would serve life in prison, where she would be beaten, stabbed,

and raped. C.M.C. testified that at the time she told this to the officers, no one had made any promises to her regarding criminal charges against her.

¶ 22　　　　C.M.C. then told the jury about defendant's sexual fixations. According to C.M.C.,

"He had his little kink where he wanted me to dress up like his little—like a little girl, probably age five to seven, and then he had to take care of me, he wanted me to call him daddy. He had his anus kink, torture kink, [bondage and discipline, domination and submission, and sadism and masochism (BDSM)], everything."

She stated that she wore a onesie and was supposed to pretend to be a baby and defendant would have sex with her. At some point, defendant told her he liked BDSM. He gave her a "BDSM contract" and told her to sign it. She testified that she felt like she had no choice except to sign it. The "contract" provided that C.M.C.'s "safety word" was "cum in me, Tony." She added that "Tony" was her father. She testified that if anything went wrong in the household, it would result in "punishment" for her. She was expected to predict what defendant wanted to eat and have dinner ready when he came home. She knew when he would be home because he had a GPS tracker, and he was also able to track her through the GPS. She was expected to work out six hours a day and dress "[v]ery skimpy, usually with no pants on." Defendant gave C.M.C. steroids to make her look like a bodybuilder. Every day, she was expected to take at least eight nude photographs and five videos of herself using sex toys. She testified that defendant controlled her phone and social media accounts. He would check her phone and delete or block contacts. She added that, in the past, he had both taken her phone away and cut off the service to her phone.

¶ 23　　　　C.M.C. testified that when R.L.R. was less than one year old, defendant was in Utah, and he asked her to record herself sucking R.L.R.'s penis. She refused and told him that was "disgusting." He continued to ask, and eventually he said he would leave if she did not. The State

asked why she did not leave. She answered, "I was in fear for my life and if I—I knew if I wasn't around, the boys' lives would be in danger." C.M.C. testified she made a recording about one minute long of her sucking R.L.R.'s penis, and she sent it to defendant via Snapchat. About one year later, defendant began threatening to show the video to the police if C.M.C. disobeyed him.

¶ 24        A conversation from October 7, 2022, was read to the jury. According to C.M.C., she told defendant that R.L.R. was complaining about his penis being hard and hurting. Defendant told C.M.C. that she needed to "stimulate" R.L.R.'s penis.. When C.M.C. questioned defendant, he said that, when he was young, a doctor told his mother that if he did not have "sex or stimulation regularly" he would have "heart failure." In the same text conversation, C.M.C. told defendant, "[R.L.R.] just fully put his face in my ass when I was trying to practice stuff for you later." Defendant answered, "Eat it, son." The State asked, "What did you take that to mean?" She answered, "He was wanting [R.L.R.] to perform sexual acts with me." She testified that they had no door on their bedroom and the children could see them having sex.

¶ 25        C.M.C. testified that defendant tried to convince her to conceive another child, with R.L.R. or R.M.R. as the father. She explained that she and defendant had been unsuccessfully trying to have another child. In the text messages, defendant sent C.M.C. a video of a father having sex with his child. Defendant tried to convince C.M.C. her children impregnating her was normal and people used to do this "all the time, like when we had kings and queens."

¶ 26        C.M.C. testified that she would let R.L.R. "touch [her] in some manner," although this was "[a]gainst [her] will." Defendant told her that R.L.R. could touch any part of her body, and she "would just have to lay there." At some point, C.M.C. asked defendant if he "liked that," referring to R.L.R. touching her, and he answered that he did. Defendant had previously told C.M.C. that he found his mother attractive when he was younger. In a message from October 24,

2022, C.M.C. asked, "I'm saying would you with your mom?" Defendant answered, "[B]ack then when I was—like, from 13 to 18, yes."

¶ 27    According to C.M.C., in the fall of 2023, defendant told her to record herself having sex with R.L.R. Defendant called this "mommy time." In January 2024, R.M.R. was asleep, and defendant told C.M.C. to have "mommy time" with R.M.R. He told her to pretend to change R.M.R.'s diaper, then rub her genitals on R.M.R.'s genitals in an attempt to have R.M.R.'s penis penetrate her vagina. During this time, defendant stood in the doorway and took pictures, which he later showed to C.M.C.

¶ 28    C.M.C. testified that defendant had her write out sexual "stories," sometimes including the children, and sometimes involving other subjects. Graphic messages about C.M.C. enjoying sex with R.L.R. were read to the jury. C.M.C. testified she felt numb and disgusted by the messages and that the messages in the conversation were sent between her phone and defendant's business phone.

¶ 29    C.M.C. told the jury that on May 1, 2024, while she was taking a bath, R.L.R. came into the bathroom and asked if he could get in the bathtub. Defendant was standing in the doorway, smiling. C.M.C. knew she was not allowed to say no, so she said yes. R.M.R. also walked in the bathroom and got in the bath. At some point, defendant left the room, and he and C.M.C. continued communicating over Snapchat. The Snapchat conversation was shown to the jury, including messages in which C.M.C. sent pictures she had taken of her and R.L.R. in the bathtub, with R.L.R.'s finger touching her vagina. She testified that they had a "rule" requiring C.M.C. to take pictures of sex acts. In the Snapchat conversation, defendant asked, "He's—he getting close on his own or are you saying something?" She answered, "No. He's getting close on his own." Defendant answered, "Good. Let him lead." She said, "I'm letting him do what he wants. I'm just laying here

spread open." Defendant replied, "Good." C.M.C. testified that, during this incident, R.L.R. also tried to put his penis inside her vagina. C.M.C. sent defendant videos of her and R.L.R., and some of those videos were shown to the jury.

¶ 30        C.M.C. testified that she, defendant, and R.M.R. went to the living room soon after. Defendant told C.M.C. to roll R.M.R. over and pretend to change his diaper. She did, then she got on top of R.M.R. She testified that defendant "direct[ed] [her] body and [R.M.R.'s] body until— like, trying to get his penis in [her] vagina." She testified defendant touched R.M.R.'s penis and tried to move it into C.M.C.'s vagina. The State asked C.M.C. why she complied with defendant's demands that night. She answered, "Because I was scared for my safety and my child's safety." She added that, by this time, defendant had physically abused her many times.

¶ 31        C.M.C. then told the jury that, early in their relationship, defendant would shove or slap her and as time went on, the physical abuse became worse. In 2023, defendant started spending hours at a time with another woman, D.S. When C.M.C. would message him asking for help with the children, defendant would come home, physically abuse C.M.C., and leave again. On one occasion, defendant shoved C.M.C., then hit his own head on the refrigerator and told C.M.C. that he would make it look like she assaulted him. When she tried to stop him, defendant called the police and told them she was attacking him. C.M.C. contacted defendant's mother for help, and his mother called the police on C.M.C.'s behalf. C.M.C. testified that, before the police arrived, "[defendant] made [her] get down on [her] knees and tell him that he was god and everything that he said [she] had to obey to or he was going to send [her] off to jail." When the police arrived, C.M.C. and defendant both told them "everything was fine."

¶ 32        C.M.C. testified that, one night shortly after this incident, defendant hung her from the rafters by a rope. Police later found the rope hanging from the rafters. When defendant hung

C.M.C., she was naked, and defendant "zapp[ed]" her with a cattle prod. C.M.C. eventually managed to pull herself up by the rope and kick defendant. Defendant took C.M.C. down from the rafters, put the rope around her neck, and began pulling it tight. At some point, he took the rope off her neck and brought her to a bed. Defendant then put his arm around her neck and choked her until she passed out. During this incident, defendant hit her feet with a metal "chopstick" until she could not walk.

¶ 33　　　　C.M.C. testified that, at one point, defendant made her seek an order of protection against her father. In the petition for the order of protection, C.M.C. claimed that her father had threatened to take her and her children against their will and had threatened to kill defendant's family if they intervened. Defendant also wanted C.M.C. to allege that her father abused her. C.M.C. testified that none of these allegations were true and her father never abused her. After this, defendant would not allow C.M.C. to communicate with her parents.

¶ 34　　　　C.M.C. also testified about messages from defendant in which he stated that he wanted her to insert a two-foot long "double-headed dildo" entirely into her anus. She testified that this was "[f]or his pleasure," she did not think this was possible, and she did not want to do this. She attempted to do this multiple times over the next week, but she felt "[b]urning" in her insides.

¶ 35　　　　C.M.C. testified that around July 30 or 31, 2023, because she could not "get the double in," she was required to cut defendant's first name into her thigh, his last name into her calf, and his middle name into her areola. She was also required to cut her labia and clitoris. While C.M.C. was cutting herself, defendant walked in, and he used the scalpel to cut deeper. C.M.C. read a series of messages where defendant criticized and demeaned her for not completing what he wanted. At one point, defendant told her "property of Austin Rodhouse" was "going on [her] neck."

¶ 36 C.M.C. told the jury that she tried to leave defendant in August 2023. She asked defendant's grandmother for help, but his grandmother told his father, and C.M.C. knew that his father would tell defendant. While C.M.C. was attempting to leave the home with the children, defendant arrived first, then his father. When the police arrived, defendant told C.M.C. he would show them the video of her and R.L.R. She agreed to leave R.L.R. with defendant and take R.M.R. to defendant's grandmother's house. She eventually moved back in with defendant, and she got the tattoo on her neck that said, "property of Rodhouse." Defendant also gave her "[l]ashings."

¶ 37 C.M.C. testified that, in the summer of 2023, when R.L.R. was three and R.M.R. was two, she saw defendant use the cattle prod on the children. When defendant took it out, the boys would run and hide. Whenever defendant used the cattle prod, it would leave red marks. Eventually, defendant broke the cattle prod so he could "beat" C.M.C. with the stick.

¶ 38 C.M.C. testified that defendant tried to get her addicted to Adderall and he made her "butt-chug" an alcohol "concoction" using an enema bulb. This would make her black out. Once, after an alcohol enema, C.M.C. awoke and could barely move. Defendant told her that people came over and defendant let them have sex with her. C.M.C. testified she did not know if this was true, but if it was, she did not consent. Pictures were admitted into evidence showing C.M.C. with black eyes and with marks she claimed were from a bullwhip. She also testified that defendant held her down and branded her. She testified that defendant would "fist" her anus and "it would mess up [her] bowels and [she] couldn't hold anything." She also claimed that defendant once made her eat undercooked hamburger. When she did not eat it fast enough, defendant hit her hand with a baseball bat. When her hand bled, defendant heated a knife and cauterized the wound, leaving a scar on her hand that was still present at the time of trial.

¶ 39 Defendant had talked to C.M.C. about getting his first name tattooed on her

forehead to prove her commitment to him. C.M.C. testified that when defendant gave her this tattoo, he also gave her other tattoos. He told her to lie on her stomach, and he put tattoos on each of her buttocks. He also tattooed something on the inside of her thigh. She did not learn what they said until defendant finished tattooing her. The State showed C.M.C. photographs of the tattoos, and she confirmed they read, "Cum whore," "Cum," and "Austin's Pussy."

¶ 40　　　　C.M.C. testified that defendant told her to put a "big red butt plug" completely inside her anus, including the base, which was not intended to go into a body. The plug was shown to the jury. C.M.C. was not able to do this, and she did not want to. When she told defendant she could not do this, defendant tried to force the base into her anus using his knee. C.M.C. told the jury this was "very painful," but she knew that if she made any noise, she would "get lashings." When she tried to crawl away, defendant grabbed her and kneed her left side, so that she could not breathe. After defendant was not able to fully insert the base into C.M.C., she bled from her anus. She testified that inside, she felt like she was "[o]n fire." Defendant removed the plug, told C.M.C. he would try again tomorrow, and put his fist in her anus. She fought against him, and defendant told her that he would remove his hand if she did not resist for 30 seconds. After defendant eventually removed his hand, she bled more, and she could not control her bowels for almost a week.

¶ 41　　　　C.M.C. told the jury that defendant sent her a picture of a finger bent 90 degrees on its side and he told C.M.C. that she needed to break her finger. She searched online for how to do this. She did not break her finger, but defendant did. He put her finger in a vise and pushed with his palm. Defendant was not satisfied with how the finger looked, so he tried to push it with his other hand. She testified she did not consent to this, the pain was "[u]nbearable," and she still felt pain at the time of trial. Images were admitted showing her body with lash marks and a finger

- 15 -

splint. Other pictures showed C.M.C. with tattoos, including a tattoo near her vulva that read " 'Austin's pussy,' " the tattoo on her forehead, and a tattoo over her left eye saying " 'Rodhouse,' " all of which defendant gave her.

¶ 42        C.M.C. explained that one day in April 2024, when defendant inserted his fist into her anus, she "tense[d] up from pain." She tried to move away from him, but they "ended up on the floor kind of wrestling." She testified, "Internally, I felt like my organs were coming out." Defendant used a wooden "Tire Knocker" to hit C.M.C. all over her body, including her left side and the back of her head. After she began bleeding profusely from her head, defendant shaved around her wound and attempted to use "Gorilla Glue" to glue the wound closed. A photograph of the gash on her head was admitted into evidence. C.M.C. told the jury that it was against defendant's rules for her to fight back and she believed the consequences were worse this time because she had. Defendant talked to her about having sex with their children a few days after this incident.

¶ 43        The State asked C.M.C., "As for all these years you've stayed, can you explain to the jury why you stuck it out?" She answered, "I stuck it out for the safety of my children, for the safety of if I wasn't there, he would just find another victim, so the safety of other women, and I didn't want to die." She believed he would never leave her alone and she would never see her sons again if she left.

¶ 44        On cross-examination, C.M.C. acknowledged that in 2020, when defendant told her to put R.L.R.'s penis in her mouth, he was on a trip to Utah, and she was alone with the children. Defense counsel asked if she had any other "sexual encounters" with her children in 2022, and she answered, "Yes." Defense counsel asked what she remembered, and she answered, "It was a trying to initiate a sexual encounter." C.M.C. explained that she was required to take pornographic videos

of herself and send them to defendant, and, that day, R.L.R. was watching her. She explained, "I was texting [defendant], telling him that [R.L.R.] is in there, and I kept telling [R.L.R] to go in the living room, and [defendant] kept telling me to see if he would join." She told R.L.R. to go to the living room, but he would not. Defendant was at work, at least two hours away.

¶ 45    C.M.C. reiterated that the allegations in the petition for an order of protection she filed against her father were false, and she acknowledged that she made these allegations under oath. Additionally, defense counsel asked if C.M.C. had any "sexual encounters" with any pets. She answered, "Yes, that [defendant] made me, yes." She added that this happened about three times.

¶ 46    Delilah S., defendant's mother, testified that she had seen a brace on C.M.C.'s finger and C.M.C. limping and wearing a "boot." In January 2024, defendant sent her a picture of C.M.C. with "Austin" tattooed on her forehead. She also testified that she received text messages that were purportedly from C.M.C., but she suspected her son sent the messages.

¶ 47    Sarah C., C.M.C.'s sister, testified that her parents never abused her and she never observed her parents abuse C.M.C. She testified that by the fall of 2023, she had lost contact with C.M.C. after C.M.C. moved away to live with defendant. In January 2024, C.M.C. contacted her mother after her forehead tattoo. Sarah C. was then able to visit C.M.C. She was told that she could only contact C.M.C. through defendant's work phone. Based on her experience messaging C.M.C. before 2024, she believed that the messages she received from defendant's work phone after that visit were not authored by C.M.C. Anthony C., C.M.C.'s father, also testified that he received text messages from C.M.C.'s phone number that he did not believe she authored.

¶ 48    In between witness testimonies, defense counsel addressed the trial court regarding the prior crimes evidence. Defense counsel asked the court to provide the jury with Illinois Pattern

Jury Instructions, Criminal, No. 3.14, (approved Oct. 17, 2014) (hereinafter IPI. Criminal No. 3.14) both during jury instruction and after the relevant testimony. Defense counsel explained that this instruction cautioned the jury that evidence of prior crimes "is only given for the purposes of identification, presence, intent, motive, design, knowledge, and may only be considered for that limited purpose." The State did not object.

¶ 49        Before A.S. testified, the trial court read the limiting instruction defense counsel requested. A.S., defendant's sister, told the jury that when she was eight or nine years old, defendant touched her vagina. She explained that defendant touched her other times, "regularly" at first, and then "rarely." Defendant called this " 'Austin massages.' " She also saw defendant touch her cousin, S.H. Defendant also had sex with A.S. multiple times. When she told him not to do it, he ignored her, or he said that he would hurt her. She testified that, during defendant and C.M.C.'s relationship, she saw a picture of C.M.C. with a black eye. In March 2024, she saw C.M.C. with the tattoo on her forehead and her finger wrapped as though it had been injured.

¶ 50        K.H. testified that she had gone to school with defendant. In February 2024, she and her two children stayed overnight with defendant and C.M.C. She testified that she drank alcohol, she became intoxicated faster than she expected, and defendant had prepared her drink. She took a bath at their home, and defendant told her she was not allowed to close the door. C.M.C. got in the bath with her and whispered that defendant told her to get in and "perform sexual acts" with her. K.H. did not consent to this. C.M.C. messaged K.H. a screenshot of defendant's message to her with instructions for what C.M.C. was to do. She was also told there was a "no-pants rule." When she did not comply, defendant was not happy because she was "breaking the house rules." She slept in the bed with defendant and C.M.C., and she could hear defendant telling C.M.C. to touch her. C.M.C. grabbed her breasts and butt, and K.H. went to the couch. Defendant followed

her and told her to go back to the bed. At first, she complied, then she left with her children.

¶ 51　　　　During February 2024, defendant told K.H. that he was keeping C.M.C. in the home using "videos of [C.M.C.] and the boys." C.M.C. did not tell her the details, but she said that defendant "had blackmail on her." K.H. testified that C.M.C. told her that defendant "forced her to perform acts with the boys, but she never said exactly what it was."

¶ 52　　　　K.L. testified she lived with defendant and C.M.C. in January 2024 after meeting defendant on Tinder. She explained that the first time she and defendant had sex, he choked her and "appl[ied] a lot of pressure." She explained, "I freaked out and grabbed a hold of his hand, he told me and whispered in my ear that it's okay because most girls like when he chokes them until they pass out." Defendant had her and C.M.C. take notes on BDSM together. Those notes were introduced into evidence. At some point, K.L. told defendant that she did not want defendant to insert anything in her anus, but defendant inserted his fingers in her anus multiple times. More than once, she awoke to defendant having sex with her. She observed defendant "giving punishments" to C.M.C., but C.M.C. did not have a say in what he was doing. She once saw defendant demand C.M.C. go outside. Defendant mixed spices to make homemade pepper spray. Defendant went outside, C.M.C. screamed, they both came back inside, and C.M.C.'s hands were over her eyes. K.L. testified she saw defendant shock his children with the cattle prod. She also heard both defendant and C.M.C. talk about a video that defendant was "holding over [C.M.C.'s] head." She had seen C.M.C. with bruises, welts on her legs, and a scar on her chest. C.M.C. once showed her a picture on her phone and explained that defendant wanted to break her finger so it was sideways. C.M.C. became frantic, not knowing how she would do this. The next day, C.M.C. had a splint on her finger. When K.L. first met defendant, she had an intrauterine device (IUD). Defendant tried to convince her to take it out, but she kept delaying. One day, defendant sat K.L.

on a table, and he used a speculum and tweezers to remove her IUD. She had "heavy bleeding" for about three weeks after this.

¶ 53 D.S. testified she dated defendant in the summer of 2023. She first met C.M.C. when she went to a party at defendant's home on July 4, 2023. Later, D.S., defendant, and C.M.C. had sex, and defendant choked D.S. until she passed out. D.S. testified she did not consent to this. She asked him not to do this again, but defendant choked her every time they had sex afterwards. She testified that defendant spoke to C.M.C. "[v]ery violently" and C.M.C. "was covered in bruises and scars and scratches and everything all the time." She saw defendant chase R.L.R. and R.M.R. with a cattle prod. R.L.R. and R.M.R. would go to C.M.C., and when defendant could not reach the boys, he would "zap" C.M.C. One night, defendant told her that C.M.C. "had ten minutes to kill herself and if she didn't do it, he was going to do it for her." She also once saw defendant sitting with his phone, which had a picture of C.M.C. in front of a mirror, and "her legs and everything was cut up." Shortly after, she saw C.M.C. leave the bathroom, with her legs covered in blood. She had heard defendant mention a video of C.M.C. and R.L.R., and he showed her a Secure Digital card with the video on it. She heard defendant tell C.M.C. she would "serve a life sentence if he turned it in." She also observed defendant smash C.M.C.'s hand in a door. After seeing this, she contacted her father, who called the police. While the police officer was on the way, defendant told D.S. that if she left, he would kill C.M.C. When the officer arrived, defendant agreed to take D.S. to a hotel.

¶ 54 The State called multiple other women to testify to their past experiences with defendant. S.H., defendant's cousin, testified that when she was around six or seven years old, defendant told her that he wanted "Austin's massages," which involved "rubbing private areas," including her breasts and pubic area. She did not remember how many times this happened, but it

was more than once. She also observed defendant giving "Austin's massages" to A.H.

¶ 55 M.T. testified she first met defendant in 2017, when she was 17 years old and he was around 24 years old. Defendant tried to convince M.T. to have sex with him and his girlfriend, and he gave them both alcohol. She eventually agreed to have sex with them, although she testified that she would not have agreed if it were not for the alcohol. Another time, when M.T. and defendant were having sex, defendant inserted his penis into her anus, even though she had previously told him she did not want this. She told him no, and he told her it would be easier the more she did it. He did not remove his penis. One day, defendant followed her into the shower. She knew this meant he wanted to have sex, and she told him no. She testified defendant picked her up, put her on the ground, and had sex with her. M.T. also testified to another incident when defendant forced her to suck his penis while he was driving.

¶ 56 Before K.O. began testifying, the trial court read the instruction defense counsel had proposed. K.O. testified she started dating defendant in May 2016. She told defendant she did not consent to anal sex, but he did it anyway. He would bend her in ways she did not want, and when she told him to stop, he kept doing it. She testified that defendant told her that if she did not do what he wanted, he would rape her sister.

¶ 57 S.L. testified that in December 2021, defendant came to her house without her knowing. He grabbed her, pulled her pants down, and inserted his penis inside her vagina. He did not ask if he could have sex with her, and she did not consent to this.

¶ 58 Defendant presented no evidence.

¶ 59 During closing argument, the State told the jury,

"[Defendant] uses his desire for another baby as a reason for [C.M.C.] to engage in sexual acts with their sons, and he is convincing her that this can happen while they

are still toddlers, which isn't true. He either has no concept of how male bodies mature over time, or he's making up another lie to get what he wants." The State added, "[Defendant] also really seems to enjoy causing [C.M.C.] shame and pain. Over time his sexual desires take more and more to satisfy him. He gets off on causing her shame. He gets off on causing her pain. You literally can see the progress over time starting from 2018 on."

¶ 60    In her closing argument, defense counsel emphasized that, in 2020, when defendant allegedly told C.M.C. to record herself with R.L.R.'s penis in her mouth, defendant was in another state. Defense counsel argued, "[The State] want[s] you to rely on somebody that would willingly put the penis of an infant in her own mouth just because somebody wouldn't leave her alone." Defense counsel emphasized that C.M.C. was given immunity from prosecution for sexual abuse in exchange for her testimony. Defense counsel insisted, "That is not a believable witness. That is not a reliable witness. That's a witness that has been bought and paid for."

¶ 61    During jury instructions, the trial court instructed the jury, "Any evidence that was received for a limited purpose should not be considered by you for any other purpose." The court repeated the instruction that evidence of defendant's uncharged conduct "has been received on the issues of the defendant's identification, presence, intent, motive, design, and/or knowledge, and may be considered by you only for that limited purpose." The court also instructed the jury,

> "Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability or opportunity to observe[,] his age, his memory, his manner while testifying, any interests, bias or prejudice he may have, the reasonableness of his testimony, considered in the light of all the evidence in the case."

¶ 62      The verdict forms submitted to the jury for the charges of predatory criminal sexual assaulted stated as follows:

> "We, the jury, find the defendant, Austin L. Rodhouse, as to the offense of Predatory Criminal Sexual Assault allowing R.L.R.'s sex organ to touch [C.M.C.]'s sex organ ***."

> "We, the jury, find the defendant, Austin L. Rodhouse, as to the offense of Predatory Criminal Sexual Assault allowing R.L.R.'s hand to touch [C.M.C.]'s sex organ ***."

> "We, the jury, find the defendant, Austin L. Rodhouse, as to the offense of Predatory Criminal Sexual Assault allowing R.M.R.'s sex organ to touch [C.M.C.]'s sex organ ***."

> "We, the jury, find the defendant, Austin L. Rodhouse, as to the offense of Predatory Criminal Sexual Assault allowing his hand to touch R.M.R.'s sex organ ***."

¶ 63      The jury found the defendant guilty on all 19 counts.

¶ 64      Defense counsel filed a motion for a judgment notwithstanding the verdict or a new trial. The motion argued, in part, that the State and the trial court denied defendant access to discovery material pretrial. The motion stated,

> "Attempts were made to get the Defendant access to his discovery, the Court and State then required Defense counsel to not only redact his own discovery without regard for what should and shouldn't be redacted, but to have Defense counsel redact it and sit with him while he reviewed it."

The court denied defendant's motion. It also sentenced him to life in prison.

¶ 65        This appeal followed.

¶ 66                              II. ANALYSIS

¶ 67        On appeal, defendant raises five issues. For the first three issues, he asks us to reverse his convictions and remand for a new trial. If we decline to order a new trial, he asks us to vacate his convictions for indecent solicitation of an adult and remand for appointment of new posttrial counsel.

¶ 68        Before addressing defendant's arguments, however, we first note that the transcript of the entire third day of trial is missing from the record on appeal. It appears that multiple witnesses testified and many photographs and messages were admitted into evidence on this day. However, we have no transcript. On appeal, the "appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984). Moreover, "[a]ny doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Id.* at 392. Here, defendant is the appellant. Therefore, we resolve any uncertainty resulting from the incomplete record against him.

¶ 69                              A. Prior Bad Acts

¶ 70        We begin with defendant's claims of ineffective assistance of counsel related to evidence that he committed various other crimes besides those he was tried for.

¶ 71        A criminal defendant's constitutional right to counsel includes the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 688, 684-86 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). We will find a defendant received ineffective assistance of counsel if he shows "(1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defendant in that, but for counsel's deficient performance,

there is a reasonable probability that the result of the proceeding would have been different." *People v. Houston*, 226 Ill. 2d 135, 144 (2007). In determining whether counsel's performance was deficient, we begin with "a strong presumption that, under the circumstances, counsel's conduct might be considered sound trial strategy." *Id.* We review claims of ineffective assistance of counsel *de novo*. *People v. Hale*, 2013 IL 113140, ¶ 15.

¶ 72 Defendant's argument concerns the evidence that he committed various criminal acts besides the 19 felonies on which he was tried. Illinois Rule of Evidence 404(b) (eff. January 1, 2011) states,

> "(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith except as provided by sections 115-7.3, 115-7.4, and 115-20 of the Code of Criminal Procedure [of 1963] (725 ILCS 5/115-7.3, 725 ILCS 5/115-7.4, and 725 ILCS 5/115-20 [(West 2024)]). Such evidence may also be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

See *People v. Illgen*, 145 Ill. 2d 353, 365 (1991) ("[T]his court has held that evidence of other offenses is admissible if it is relevant for any purpose other than to show the propensity to commit crime."). Sections 115-7.3 and 115-7.4 of the Code of Criminal Procedure of 1963 create exceptions to this general rule. Section 115-7.3 states that if a defendant is accused of certain offenses, including criminal sexual assault and predatory criminal sexual assault of a child, then evidence that the defendant committed other offenses listed in this section "may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(a)-(b) (West 2024). Similarly,

section 115-7.4 states,

> "In a criminal prosecution in which the defendant is accused of an offense of domestic violence as defined in paragraphs (1) and (3) of Section 103 of the Illinois Domestic Violence Act of 1986, or first degree murder or second degree murder when the commission of the offense involves domestic violence, evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 115-7.4(a) (West 2024).

¶ 73 Here, the trial court granted the State's motions *in limine* and allowed the State to introduce evidence that defendant engaged in criminal behavior far beyond the 19 felonies for which he was tried. In its motions, the State argued that these prior crimes demonstrated defendant's "propensity" for sexual violence and domestic violence, as allowed by sections 115-7.3 and 115-7.4. The court's orders allowed the State to introduce evidence of many of defendant's prior criminal acts.

¶ 74                     1. *Failure to Object and Eliciting Testimony*

¶ 75 At trial, both the State and defense counsel elicited testimony about other prior criminal acts besides those discussed in the State's motions *in limine*. Officer Glass read text messages off a PowerPoint presentation with graphic descriptions of defendant's instructions to C.M.C. to insert an object into her anus and her efforts to do so and C.M.C.'s cutting herself in an effort to appease defendant. Photographs and a video supporting C.M.C.'s testimony were shown to the jury. The State had not included this incident in either of its motions *in limine*. Defendant recites a long list of other criminal acts discussed at trial that were not mentioned in the State's pretrial motions, including defendant demanding that C.M.C. perform oral sex on R.L.R., hanging

her from the rafters by a rope, shocking her with a cattle prod, branding her, tattooing her with his name, striking her with a wooden rod and leaving a gash on her head, and giving her alcohol enemas. Defense counsel did not object to this evidence. Indeed, while cross-examining C.M.C., defense counsel herself elicited testimony that defendant instructed C.M.C. to have sex with animals, a fact unrelated to the offenses he was tried on.

¶ 76　　　　Defendant argues that his attorney was ineffective in failing to object to this evidence and in eliciting this testimony. According to defendant, this evidence was highly prejudicial, and the jury may have convicted him based on these other uncharged offenses, rather than the offenses he was on trial for. Defendant also claims that much of this evidence was cumulative and had little probative value. Finally, defendant contends evidence of uncharged conduct must be disclosed pretrial and the State did not comply with this disclosure requirement. See *id.* § 115-7.3(d), 115-7.4(c); see also Ill. R. Evid. 404(c) (eff. Jan. 1, 2011).

¶ 77　　　　We first address defense counsel's questions to C.M.C. about her having sex with animals. Defendant has not overcome the presumption that these questions were part of a reasonable trial strategy. See *Houston*, 226 Ill. 2d at 144. Defense counsel's strategy at trial included attempting to discredit C.M.C. as a witness and presenting her as the primary offender, rather than defendant. For example, defense counsel emphasized that defendant was in another state when C.M.C. recorded the video of her putting her mouth on R.L.R.'s penis. Through such evidence, defense counsel attempted to undermine C.M.C.'s claims that defendant controlled her actions. Indeed, C.M.C.'s responsibility for the child abuse and her untrustworthiness were key themes of defense counsel's closing argument. Although this strategy certainly was limited, given that defendant presented no evidence whatsoever after the State rested, it is likely that defense counsel concluded her best chance at trial required arguing that C.M.C. was either lying or was

herself solely responsible for the most egregious crimes. Eliciting testimony that C.M.C. had sex with animals was part of defense counsel's overall strategy of discrediting C.M.C. Defendant has not overcome the strong presumption that this strategy was reasonable.

¶ 78    Similarly, defense counsel could have made a reasonable strategic decision to allow the evidence of C.M.C. putting her mouth on R.L.R.'s penis. Certainly, C.M.C. testified she did this on defendant's instructions. Nevertheless, defense counsel heavily relied on this incident in attempting to discredit C.M.C. On cross-examination, C.M.C. acknowledged that defendant was in Utah when this took place. During her closing argument, defense counsel argued that the jury could not trust a witness who would sexually abuse her own child merely because someone insisted. Given the importance of C.M.C.'s testimony to the State's case, defense counsel reasonably sought ways to discredit her. Allowing evidence that she sexually abused R.L.R. while defendant was in another state was a reasonable way to pursue that strategy, especially if the defense had no other evidence to present.

¶ 79    For some of the evidence of other offenses defendant lists, an objection would clearly have been futile, as this evidence was part of C.M.C.'s description of the offenses defendant was charged with. For example, defendant argues the evidence that he beat C.M.C. with a piece of wood in April 2024, leaving a gash in her head, was inadmissible other crimes evidence. However, in count 47, defendant was charged with aggravated criminal sexual assault in using force to insert his hand into C.M.C.'s anus, on or about April 8 to April 30, 2024. In testifying that defendant beat her with a wooden tire knocker, C.M.C. was simply describing what happened when she tried to resist this charged rape. Similarly, count 27 alleged defendant strangled C.M.C. between June 1 and August 31, 2023. The evidence defendant shocked C.M.C. with a cattle prod and hung her from the rafters was part of C.M.C.'s description of the charged conduct. An objection to evidence

of defendant's continuing violence in the moments immediately before and after he committed the charged offenses would have been futile, and defense counsel was not ineffective in failing to raise this objection.

¶ 80    For the remainder of the evidence of other crimes, we find no reasonable probability that the result of the trial would have been different if it had not been admitted. We acknowledge the highly disturbing nature of this evidence, especially the evidence of C.M.C. cutting herself. We further acknowledge defendant's argument that the jury may have convicted him based on these other uncharged acts, rather than the evidence of his charged conduct.

¶ 81    Nevertheless, the evidence that defendant committed the charged conduct was overwhelming. We need not summarize all the evidence admitted throughout the nine-day trial again. Instead, we highlight some of the most compelling evidence of defendant's guilt.

¶ 82    Of course, C.M.C.'s testimony provided the most important evidence against defendant. C.M.C. testified extensively to defendant's years of horrific abuse. She testified to defendant kicking her side, choking her until she passed out, breaking her finger in a vise, and tattooing her. She detailed defendant's extreme sexual violence, including his forcing objects in her anus so violently that she lost bowel control afterward. She also described defendant's demands for and his participation in the sexual abuse of the couple's children.

¶ 83    Defendant contends that there was a reasonable probability that the exclusion of evidence of other crimes would have yielded a different result at trial because C.M.C.'s credibility was seriously compromised. Defendant points to C.M.C.'s carrying out the sexual abuse of her own children to discredit her. C.M.C. admitted that she committed perjury when she falsely claimed her father abused her to support a petition for an order of protection. Defendant further claims there was little evidence supporting C.M.C.'s allegations. Although the State introduced

evidence of messages purportedly sent between defendant and C.M.C, defendant contends that only C.M.C.'s testimony indicated defendant authored these messages.

¶ 84       We disagree with defendant's characterization of C.M.C. as a wholly unreliable witness. Certainly, we acknowledge that the jury may have viewed C.M.C.'s participation in the abuse and her admission to perjury as undermining her credibility. Alternatively, the jury may have viewed C.M.C. as more credible because of her willingness to admit to such criminal activity.

¶ 85       More importantly, contrary to defendant's claims, a great deal of evidence corroborated C.M.C.'s testimony. Multiple medical professionals testified to C.M.C.'s injuries, including her ruptured spleen, a liter of old blood in her abdomen, her injured finger, and her graphic tattoos. Police located a broken cattle prod, a vise, and a rope hanging from the rafters in defendant's home. Other women testified that they witnessed defendant's conduct. For example, both D.S. and K.L. testified they saw defendant chase the children with a cattle prod. K.L. also witnessed C.M.C. panic when considering how to fulfill defendant's demand that she break her own finger, and she saw C.M.C. wearing a splint the next day. There was also testimony from other women that conclusively demonstrated defendant's history of extreme sexual violence.

¶ 86       The Snapchat messages between defendant and C.M.C. also strongly supported her testimony. Defendant's claim that only C.M.C.'s testimony showed defendant authored the messages is incorrect. In the many messages that were introduced, defendant and C.M.C. demonstrated a clearly distinct voice and manner of speech. Indeed, C.M.C.'s sister, her father, and defendant's mother testified they believed they could recognize if C.M.C. or defendant authored a message. Moreover, the characterization of defendant by the other women he assaulted supported C.M.C.'s claim that defendant authored the disturbing content in the messages. Additionally, police seized defendant's cell phones and extracted data from those phones. While a

message being sent from defendant's phone does not directly prove that he authored the message, it provides significant evidence that he was the author. Once again, we note that the testimony of the police analyst is not included in the record on appeal, and we hold this absence against defendant.

¶ 87　　　　Defendant contends that some of his convictions resulted exclusively from C.M.C.'s testimony and no other evidence, and therefore, the evidence against him was weak. Specifically, defendant refers to his convictions for predatory criminal sexual assault of a child resulting from defendant placing R.M.R.'s penis inside C.M.C.'s vagina. He also refers to his convictions for aggravated domestic battery resulting from his strangling C.M.C. and tattooing " 'cum whore' " on her buttocks. Finally, he refers to the convictions for aggravated criminal sexual assault that resulted from him forcing a butt plug and his hand into C.M.C.'s anus and from him raping C.M.C. after he ruptured her spleen in May 2024.

¶ 88　　　　Defendant's contention that only C.M.C.'s testimony supported these charges is patently false. As stated above, the extensive list of defendant's prior sexual assaults that were properly admitted demonstrated defendant's propensity for domestic battery and sexual violence. As the trial court observed, they also demonstrated defendant's particular fixation with violent anal sex. Additionally, the State introduced Snapchat messages between defendant and C.M.C. showing defendant's preoccupation with his children having sex with C.M.C. Defendant's conviction for strangulation resulted from the incident where he hung C.M.C. from the rafters, shocked her with a cattle prod, and then choked her until she lost consciousness. When police executed a search warrant, they found a piece of the cattle prod, and the rope was hanging from the rafters. Defendant's claim that C.M.C.'s testimony provided the only evidence that defendant tattooed " 'cum whore' " on her buttocks is especially galling, given the photograph of this tattoo on her

body.

¶ 89    Finally, defendant introduced no evidence whatsoever. Again, we recognize that the evidence of defendant's other crimes was repulsive. And yet, the evidence that defendant committed the charged offenses was so strong that we find no reasonable probability the jury would have reached a different result, even if defense counsel had objected to the other crimes evidence not discussed in the State's pretrial motions.

¶ 90                    2. *Jury Instruction*

¶ 91    During the trial, defense counsel asked the trial court to instruct the jury that it could consider evidence of defendant's uncharged conduct "for the purposes of identification, presence, intent, motive, design, [and] knowledge." This instruction followed IPI Criminal No. 3.14, and it did not mention defendant's propensity for any illegal conduct. The court read this instruction to the jury in between the testimony of witnesses and after closing arguments.

¶ 92    Defendant contends the jury should not have been instructed to consider his prior bad acts for reasons other than his propensity for crime. He argues his attorney was ineffective in requesting this instruction. According to defendant, evidence of his prior acts was not admissible for any purpose except to show propensity. He asserts that he did not contest identity or design and his prior bad acts were not relevant to his presence, motive, or knowledge for any of the charged offenses, or to any purpose except for propensity. For example, he argues that the evidence that he sexually abused A.S. and S.H. over 15 years before the trial was not relevant to his identity, motive, or any other of the listed reasons and the jury's consideration of these reasons was prejudicial. He further contends that any value in this evidence was substantially outweighed by its prejudicial impact, especially considering the accumulation of all defendant's bad acts.

¶ 93    Defendant's ineffective assistance claim fails for two reasons. First, even if

defendant was correct that the jury should not have considered his prior crimes for purposes other than propensity, he has not overcome the strong presumption that defense counsel's requested instruction was a valid trial strategy. "It is well-settled that trial counsel's decision as to what jury instructions to tender is one of several determinations widely recognized as matters of trial strategy that are generally immune from ineffective assistance claims." *People v. Elizondo*, 2021 IL App (1st) 161699, ¶ 92. Aside from this general principle, here, defendant affirmatively benefited from the trial court's decision to provide IPI Criminal No. 3.14. This instruction does not mention "propensity" at all. Indeed, the court never instructed the jury it could consider defendant's prior bad acts to show his propensity for criminal behavior. Instead, the court instructed the jury that evidence received for a limited purpose could be considered only for that purpose and that the evidence of defendant's prior acts was received for the listed reasons other than propensity. Moreover, because sections 115-7.3 and 115-7.4 allow evidence to be admitted for any matter for which it is relevant, defendant was not entitled to any limiting instruction. By requesting IPI Criminal No. 3.14, defense counsel succeeded in having the uses of defendant's prior bad acts limited. This was a reasonable trial strategy.

¶ 94        Second, defendant was not prejudiced by this instruction. For the reasons stated above, the evidence against defendant was overwhelming. Moreover, if defense counsel had not requested IPI Criminal No. 3.14, the jury either would have been instructed that it could consider defendant's prior bad acts to show defendant's character and his propensity for violence, or it would have received no limiting instruction at all. We see no reasonable probability that the jury would have reached a different result based on either possibility. Therefore, defendant's ineffective assistance claim fails.

¶ 95                              B. Accomplice Instruction

¶ 96    Next, defendant argues his attorney was ineffective because she failed to request a jury instruction on the limitations of testimony from a criminal accomplice. Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2024) (hereinafter IPI Criminal No. 3.17) provides, "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." Defendant argues C.M.C. was his accomplice in some of the charged offenses, including the child pornography and predatory criminal sexual assault of a child charges. The State guaranteed that her testimony would not be used against her in future prosecutions. Defendant insists that he was entitled to an instruction on the weaknesses of C.M.C.'s testimony. According to defendant, because the State relied so extensively on C.M.C.'s testimony and insisted that she was reliable in its closing argument, there is a reasonable likelihood that the result of the trial would have been different if the trial court instructed the jury that C.M.C.'s testimony was suspect.

¶ 97    We find no reasonable likelihood that the result of the trial would have been different if the jury heard IPI Criminal No. 3.17. The court cautioned the jury to consider each witness's "interests, bias or prejudice." See *People v. McCallister*, 193 Ill. 2d 63, 97 (2000) ("[T]he fact that the jury was told to consider, in general, the bias, interest or prejudice of the witnesses may be considered as one factor, *among others*, which establishes that [the] defendant was not prejudiced by his trial counsel's failure to tender the accomplice witness instruction." (Emphasis in original.)). Other factors here included defense counsel's emphasis on reasons to be critical of C.M.C.'s testimony during her closing argument and the overwhelming evidence discussed above. We are not persuaded that an additional reminder to the jury that C.M.C.'s testimony should be viewed with caution would have changed the result of trial.

¶ 98                    C. Acts Committed for Purposes of Sexual Gratification

¶ 99          Defendant's next arguments concern his convictions for predatory criminal sexual assault of a child. Defendant was convicted under section 11-1.40(a) of the Criminal Code of 2012 (720 ILCS 5/11-1.40(a) (West 2024)), which states,

          "(a) A person commits predatory criminal sexual assault of a child if that person is 17 years of age or older, and commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another *for the purpose of sexual gratification or arousal of the victim or the accused*, or an act of sexual penetration, and:

                    (1) the victim is under 13 years of age[.]" (Emphasis added).

Defendant's arguments focus on the "sexual gratification" element of this offense. Defendant observes that the State did not rely on the "sexual penetration" provision in this statute. Instead, the State argued that the acts alleged in counts 4, 5, 6, and 10 were each committed for the purpose of the sexual gratification of defendant or the victims.

¶ 100                              1. *Sufficiency of the Evidence*

¶ 101          First, defendant argues the State failed to prove that he committed the acts underlying his convictions for predatory criminal sexual assault of a child for the purpose of sexual gratification beyond a reasonable doubt.

¶ 102          "The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)); see U.S. Const., amend. XIV. "Where a criminal conviction is challenged based on

insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *People v. Murray*, 2019 IL 123289, ¶ 19. We will not substitute our judgment for the jury's "on issues involving the weight of the evidence or the credibility of the witnesses." *Id.*

¶ 103     Defendant argues that the State did not prove he committed the acts alleged in counts 4, 5, 6, and 10 for the purpose of sexual gratification. This intent is "typically inferred from circumstantial evidence." *People v. Holmes*, 2018 IL App (3d) 160060, ¶ 20. Defendant refers to *In re M.H.*, 2019 IL App (3d) 180625, ¶ 17, and *In re D.H.*, 381 Ill. App. 3d 737, 741 (2008), for descriptions of such circumstantial evidence. *M.H.* stated that circumstantial evidence of intent for sexual gratification includes "the removal of clothing, heavy breathing, placing the victim's hand on the accused's genitals, an erection, or other observable signs of arousal," as well as sexually explicit statements. *M.H.*, 2019 IL App (3d) 180625, ¶ 17. In *D.H.*, the court explained, "Statements that show a consciousness of guilt can support the inference that the accused intended to gratify his sexual desires." *D.H.*, 381 Ill. 2d 741. Defendant claims that no such circumstantial evidence was present here.

¶ 104     Defendant also relies on the State's comments during the trial to show that he did not commit the charged conduct for the purpose of sexual gratification. When discussing the evidence that defendant wanted R.L.R. to impregnate C.M.C., the State commented that defendant either did not understand male sexual development or was simply lying. Instead, the State argued that defendant's goal was to cause C.M.C. "shame and pain." According to defendant, even the State acknowledged that these acts were committed to shame C.M.C. rather than for sexual gratification.

¶ 105    Finally, defendant emphasizes that the State had to prove he had the specific intent for sexual gratification at the time the acts were committed. See *People v. Rossi*, 112 Ill. App. 2d 208, 211 (1969); *People v. Beasley*, 41 Ill. App. 3d 550, 552 (1976). Defendant argues that any statements he made before May 2024 about R.L.R. or R.M.R. impregnating C.M.C. were irrelevant to his intent in May 2024.

¶ 106    We find a more than sufficient basis to support the jury's verdict. Defendant misrepresents both the law and the record on this issue.

¶ 107    First, no additional evidence showing defendant's purpose was necessary. Indeed, "[a] defendant's intent to arouse or gratify himself sexually can be inferred solely from the nature of the act." *People v. Burton*, 399 Ill. App. 3d 809, 813 (2010). Here, defendant's convictions for predatory criminal sexual assault of a child resulted from his compelling C.M.C. to engage in sexual contact with R.M.R. and R.L.R. C.M.C. testified that R.L.R. touched her vagina and then tried to put his penis inside her vagina. Soon after, defendant told C.M.C. to get on top of the infant R.M.R. Defendant also touched R.M.R.'s penis and tried to insert it into C.M.C.'s vagina. Defendant could not intend contact between R.L.R.'s and R.M.R.'s penises and C.M.C.'s vagina and himself attempt to insert R.M.R.'s penis into C.M.C.'s vagina without intending sexual gratification. This is simply apparent from the fact of the actions. The entire encounter was transparently intended for sexual gratification. See *People v. Kitch*, 2019 IL App (3d) 170522, ¶ 45 ("Under these circumstances, [the] defendant's actions could not have had an innocent purpose like accidental contact or contact required by a medical exam or procedure.").

¶ 108    Moreover, defendant's reliance on *M.H.* and *D.H.* is grossly misplaced. Both those cases involved adjudications of juvenile delinquency. In *M.H.*, the juvenile respondent was accused of committing criminal sexual abuse when he was 11 years old. *M.H.*, 2019 IL App (3d)

180625, ¶ 1. In *D.H.*, the respondent was 12 years old at the time of the offense. *D.H.*, 381 Ill. App. 3d at 738. In each case, the appellate court stressed that while intent for sexual gratification can be inferred for adults, such inferences are less justified when the accused is a minor. See *M.H.*, 2019 IL App (3d) 180625, ¶ 16; *D.H.*, 381 Ill. App. 3d at 741. In *M.H.*, the court explained,

> "The trier of fact 'must consider all of the evidence, including the offender's age and maturity, before deciding whether intent can be inferred.' [Citation.] The closer the accused is to the age of majority, the more plausible it is for the court to infer that the accused acted for the purpose of sexual gratification and arousal." *M.H.*, 2019 IL App (3d) 180625, ¶ 18 (quoting *In re Matthew K.*, 355 Ill. App. 3d 652, 657 (2005)).

Defendant here was well past the age of majority when he committed these offenses. *M.H.*'s and *D.H.*'s discussions of circumstantial evidence are wholly inapplicable in this case.

¶ 109    Even if *M.H.* were applicable, however, in claiming that there was no circumstantial evidence of defendant's actions being for the purpose of sexual gratification, defendant is blatantly mischaracterizing the record. Indeed, there was abundant circumstantial evidence of defendant's intent for sexual gratification. Before May 2024, defendant made many sexually explicit comments concerning his children. For example, when C.M.C. told defendant, "[R.L.R.] just fully put his face in my ass when I was trying to practice stuff for you later," defendant answered, "Eat it, son." We reject defendant's claim that such earlier comments were irrelevant to his intent in May 2024. Indeed, such comments established defendant's persistent eagerness to sexualize his extremely young children and their relationship with their mother. Moreover, on May 1, 2024, when C.M.C. and R.L.R. were in the bath, defendant asked if R.L.R. was "getting close on his own." When C.M.C. responded affirmatively, defendant answered, "Good. Let him lead." When C.M.C. told

defendant, "I'm just laying here spread open," defendant replied, "Good." This conversation clearly provides the sort of circumstantial evidence discussed in *M.H.* Moreover, C.M.C. testified that defendant had a "kink" of wanting her to dress as a little girl and call him "daddy" and he wanted her to wear a onesie and act like a baby while he had sex with her. There was also clear evidence of defendant's history of committing sexual abuse, including abusing children. S.H. testified defendant abused her when she was six or seven years old. A.S. testified defendant abused her "regularly" when she was eight or nine years old. Their descriptions of defendant's conduct also strongly supported the conclusion that defendant intended the contact between the children's bodies and C.M.C.'s genitals to be for the purpose of sexual gratification.

¶ 110    Furthermore, although defendant certainly intended to shame C.M.C., this does not eliminate his intent for sexual gratification. If he intended to shame C.M.C. through coercing her to sexually gratify her children, then his purpose still included sexual gratification. Moreover, the State introduced more than sufficient evidence for the jury to conclude that defendant himself derived sexual satisfaction through shaming and harming women. For example, C.M.C. testified that defendant had told her she needed to let R.L.R. touch her anywhere and defendant confirmed that he "liked that." Additionally, defendant demanded that C.M.C. engage in self-destructive anal sex acts, and the State proved defendant committed multiple criminal sexual assaults by forcing objects or his fist into C.M.C.'s anus and injuring her. Through such acts, defendant escalated his established anal fixation by subjecting C.M.C. to degrading treatment. Even when defendant also intended to shame C.M.C., there was abundant proof of defendant's intent to sexually gratify himself, and his sufficiency-of-the-evidence argument plainly fails.

¶ 111                                  2. *Verdict Forms*

¶ 112    Defendant further argues that the verdict forms improperly omitted the "sexual

gratification" element. Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013) requires a trial court to use applicable pattern jury instructions in criminal cases unless the instructions do not accurately state the law. Illinois Pattern Jury Instructions, Criminal, No. 26.05 (approved Dec. 8, 2011) provides a verdict form that states, "We, the jury, find the defendant _____ guilty of _____." Here, the trial court used the verdict forms provided by the State. These forms added a brief description of each offense, but they did not include the element of "sexual gratification." For example, one verdict form stated, "We, the jury, find the defendant, Austin L. Rodhouse, as to the offense of Predatory Criminal Sexual Assault allowing R.L.R.'s sex organ to touch [C.M.C.]'s sex organ."

¶ 113    Defense counsel did not object to the verdict forms, offer alternative forms, or raise this issue in a posttrial motion. Therefore, this issue is forfeited. See *People v. Duffie*, 193 Ill. App. 3d 737, 741 (1990) ("The general rule is that the failure to object at trial to an asserted error in jury instructions waives the question, and no party may raise the failure to give an instruction unless he tendered it at trial.").

¶ 114    Defendant asks us to review this issue as plain error. Rule 451(c) states that "substantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). This rule "is coextensive with the 'plain error' clause of [Illinois] Supreme Court Rule 615(a) [(eff. Jan. 1, 1967)], and we construe these rules 'identically.' " *People v. Herron*, 215 Ill. 2d 167, 175 (2005) (citing *People v. Armstrong*, 183 Ill. 2d 130, 151 n.3 (1998)). Rule 615(a) states, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). We will find plain error only where "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *Herron*, 215 Ill. 2d at 187; see *People v. Hartfield*,

2022 IL 126729, ¶ 50. Whether the jury instructions accurately stated the law is a question of law, which we review *de novo*. *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 115    Defendant argues that the jury may have been confused because the verdict forms included elements of each offense but omitted the "sexual gratification" element. Defendant contends that these forms conflicted with trial court's other jury instructions, which included this element. Citing *People v. Haywood*, 82 Ill. 2d 540, 545 (1980), *People v. Pollock*, 202 Ill. 2d 189, 212 (2002), *People v. Bush*, 157 Ill. 2d 248, 254 (1993), and *People v. Hartfield*, 2022 IL 126729, ¶ 59, defendant claims conflicts between verdict forms and jury instructions are reversible errors.

¶ 116    The State relies on *Duffie*. There, a jury found the defendant guilty of three counts of armed violence after he shot two victims. *Duffie*, 193 Ill. App. 3d at 738. The trial court properly instructed the jury on the elements of armed violence, including the requirement that the defendant acted " 'knowingly.' " *Id.* at 740. The trial court also provided nonpattern jury instructions, which stated, " 'We, the jury, find the defendant *** guilty of the offense of Armed Violence for causing great bodily harm to [the first victim] with a dangerous weapon,' " and, " 'We, the jury, find the defendant *** Guilty of the offense of Armed Violence for causing great bodily harm to [the second victim] while [the second victim] was on the public way with a dangerous weapon.' " *Id.* at 741. On appeal, the defendant argued that because these forms omitted the mental state element, they conflicted with the jury instructions.

¶ 117    The appellate court found no error. First, the court stated, "There is no requirement that the jury verdict forms recite the precise elements of the crime so long as the offense is properly identified." *Id.* at 742. Second, the court reasoned that instructions are considered as a whole, not individually, and the trial court's instructions overall correctly stated the law. Third, the appellate court found no conflict between the forms and the instructions. Instead, "[t]he verdict forms were

merely less complete than the issues instructions." *Id.* Finally, the court explained, "Because of the multiple, similar counts charged in this case, the trial court clearly found it necessary to add the circumstances of each count in order to identify each count for the benefit of the jury and for the clarity of the record." *Id.* at 742-43. Therefore, the appellate court concluded that the verdict forms were proper. *Id.* at 743.

¶ 118       We find *Duffie*'s reasoning applicable, and we find no error. Here, the trial court properly instructed the jury on the "sexual gratification" requirement. The verdict forms did not state there was no such requirement. As in *Duffie*, the verdict form was "merely less complete than the issues instruction," and there was no conflict between the two descriptions of the offense. *Id.* at 742. Moreover, although the verdict forms included some description of each offense without including the "sexual gratification" element, the description of each offense was clearly intended to clarify for the jury what specific conduct provided the basis for each offense. See *id.* at 742-43. The State introduced evidence that defendant committed many crimes. The State reasonably included a brief description of the specific conduct the jury needed to find defendant committed to find him guilty of each offense. There was no need for this brief description to repeat the formal elements of the offense. Especially in this context, the omission of one of the elements from the verdict form was no error.

¶ 119       Defendant attempts to distinguish *Duffie* by claiming the omission of the "sexual gratification" element from the verdict form was a more egregious omission than the mental state requirement from *Duffie*, especially because of his further claim that the State failed to prove the "sexual gratification" requirement.

¶ 120       We disagree. Both the mental state requirement in *Duffie* and the "sexual gratification" requirement are elements of the offense. Therefore, their omission from the verdict

forms is comparable. Moreover, as explained above, we wholly reject defendant's argument regarding the sufficiency of the evidence. Defendant fails to distinguish *Duffie*, and we find that case directly applicable here.

¶ 121　　　　Alternatively, defendant claims his attorney was ineffective in failing to propose alternative verdict forms. Because we find the trial court did not err in providing the verdict forms that it did, we find counsel was not ineffective in failing to provide alternative forms. See *People v. Coates*, 2025 IL App (4th) 231312, ¶ 51 ("Because we find the jury was properly instructed, we need not consider defendant's ineffective assistance of counsel argument.").

¶ 122　　　　　　　　　　　　　D. One-Act, One-Crime

¶ 123　　　　Defendant claims that his convictions for predatory criminal sexual assault of a child resulted from the same acts as his convictions for indecent solicitation of an adult. He asks us to vacate his convictions for incident solicitation under the one-act, one-crime rule.

¶ 124　　　　The one-act, one-crime rule provides that a "defendant may not be convicted of multiple offenses based on the same physical act." *People v. Almond*, 2015 IL 113817, ¶ 47. However, "[m]ultiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts." *People v. King*, 66 Ill. 2d 551, 566 (1977). "For purposes of the rule, an 'act' is defined as any overt or outward manifestation that will support a separate conviction." *Almond*, 2015 IL 113817, ¶ 47; see *King*, 66 Ill. 2d at 566. "The application of the one-act, one-crime rule is a question of law subject to *de novo* review on appeal." *People v. Johnson*, 387 Ill. App. 3d 780, 792 (2009).

¶ 125　　　　Here, counts 4, 5, and 6 each alleged defendant committed predatory criminal sexual assault of a child by being legally responsible for C.M.C.'s acts of contact between her sex organ and R.L.R.'s sex organ or hand and R.M.R.'s sex organ. Counts 14, 15, and 16 each alleged

defendant committed indecent solicitation of an adult in arranging for C.M.C. to commit those acts of sexual conduct.

¶ 126    Defendant argues that these indecent solicitation charges resulted from the same physical acts as the sexual assault charges. He emphasizes that he was convicted for criminal sexual assault of a minor based on his accountability for C.M.C.'s actions. The jury was instructed that "[a] person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he knowingly *solicits* *** the other person in the planning or commission of the offense." (Emphasis added.) See Illinois Pattern Jury Instructions, Criminal, No. 5.03 (approved Apr. 28, 2023). Defendant argues that his convictions for criminal sexual assault of a child relied on his solicitation of C.M.C., which was the same act that provided the basis for the solicitation convictions. Defendant concludes that his convictions for indecent solicitation should be vacated.

¶ 127    We disagree. There were clearly separate acts that provided the bases for the indecent solicitation and the sexual assault convictions. The indecent solicitation convictions resulted from defendant soliciting C.M.C. to engage in various sex acts with her children. The sexual assault convictions resulted from the actual contact between C.M.C.'s sex organ and the children's bodies. Defendant is accountable for both the solicitation of those contacts and the contacts themselves, which were clearly separate physical acts. Even if defendant was legally responsible for C.M.C.'s conduct as a result of the same messages, demands, or pattern of control and abuse that underpinned his solicitation convictions, the acts of contact themselves were still separate acts that could sustain separate convictions.

¶ 128    Defendant compares this case to *People v. Crespo*, 203 Ill. 2d 335 (2001). There, the defendant stabbed a victim three times. *Id.* at 338. He was convicted of aggravated battery and

- 44 -

armed violence. On appeal, he argued that his conviction for aggravated battery should be vacated because it was based on the same physical act as his conviction for armed violence. *Id.* at 340. The State responded that each stab constituted a different act that could sustain a separate conviction. *Id.* The supreme court acknowledged that each stab could constitute a separate offense. However, in the indictment, the counts alleging aggravated battery and armed violence did not differentiate between the stabbings. *Id.* at 342. Throughout the proceedings, the State treated all the stabbings as the basis for the offenses together. The court declined to "apportion the crimes among the various stab wounds for the first time on appeal." *Id.* at 343. The court agreed with the defendant's one-act, one-crime argument, and it concluded that the defendant's conviction for aggravated battery should be reversed. Defendant argues the same reasoning applies here.

¶ 129    *Crespo* is clearly inapplicable. There, the indictment did not distinguish between the act that provided the basis for the aggravated battery and the act that provided the basis for the armed violence. Here, the indictment alleged defendant committed criminal sexual assault when C.M.C. had sexual contact with the children. The indictment alleged that defendant committed the solicitation offenses when he "knowingly arranged" for those acts of contact. Defendant's "arrang[ing]" for the contact is clearly distinct from the contact itself. We have no difficulty distinguishing the solicitations from the sexual assaults. Therefore, *Crespo* does not apply.

¶ 130    Defendant's solicitations of C.M.C. are each their own act, each supporting a conviction. The sexual assaults themselves are additional, separate physical acts. Defendant's convictions are therefore not "based on the same physical act." *Almond*, 2015 IL 113817, ¶ 47. Accordingly, we reject defendant's one-act, one-crime claim.

¶ 131                                          E. Posttrial Counsel

¶ 132    Finally, defendant claims that his postconviction counsel suffered from an actual

- 45 -

conflict of interest.

¶ 133 A defendant's right to effective assistance of counsel extends to posttrial proceedings. *People v. Jenkins*, 2020 IL App (3d) 180551, ¶ 18. This includes the right to "conflict-free representation." *People v. Peterson*, 2017 IL 120331, ¶ 102. "To succeed on an actual conflict-of-interest claim, the defendant must establish that the conflict adversely affected counsel's performance." *Id.* ¶ 105. The defendant must "identify a specific deficiency in his counsel's strategy, tactics, or decision making that is attributable to the alleged conflict." *People v. Yost*, 2021 IL 126187, ¶ 38. "Where the facts in the record are undisputed, the issue of whether an attorney operated under a conflict of interest is a legal question subject to *de novo* review." *People v. Schutz*, 2017 IL App (4th) 140956, ¶ 14.

¶ 134 Here, before trial, defendant asked his attorney to see the discovery material. Based on the discussion before the trial court, defense counsel provided at least some of the discovery material to defendant. However, defense counsel did not comply with Illinois Supreme Court Rule 415(c) (eff. Oct. 23, 2020), which states,

> "Any materials furnished to an attorney pursuant to these rules shall remain in his or her exclusive custody unless the court authorizes dissemination pursuant to this rule, shall be used only for the purposes of conducting his or her side of the case, and shall be subject to such other terms and conditions as the court may provide. Upon motion of the attorney, the court shall, within 5 court days, enter an order allowing the attorney to provide a copy of the discovery to the defendant unless good cause is shown why the discovery should not be furnished to the defendant. Absent the court order allowing otherwise, materials furnished to a defendant by a defense attorney pursuant to these rules shall not contain any contact information

for the witnesses, mental health counselors or victim's advocates, or other personal identifiers of such witnesses such as addresses; dates of birth; phone numbers; Social Security numbers; financial institution information; driver's license and state identification numbers; checking, credit, or debit card information; e-mail address or other social media contacts; or medical or mental health records and shall not contain photographs or videos of victims of sexual assault, sexual abuse, or child pornography."

¶ 135    Defendant contends that his counsel's failure to comply with Rule 415(c) constituted ineffective assistance of counsel. Defendant further contends that his counsel's failure to argue her office's ineffectiveness in her posttrial motion resulted from an actual conflict of interest. See *People v. Garcia*, 2018 IL App (5th) 150363, ¶ 48 ("Under such circumstances, counsel's loyalty is divided between the defendant's interests and counsel's own self-interests."). If defense counsel argues her own ineffectiveness with competence and zeal, there is no actual conflict of interest. See *People v. Zirko*, 2021 IL App (1st) 162956, ¶ 25. Here, counsel did not argue her own ineffectiveness at all. Instead, her discussion of the discovery material in the posttrial motion focused on the actions of the State and the trial court, not her co-counsel's actions. Defendant claims this reluctance to argue ineffective assistance constituted an actual conflict of interest.

¶ 136    Defendant's claim of a conflict of interest depends on a faulty premise. Specifically, defendant claims that his attorney was ineffective in failing to ensure he was able to review the discovery material before trial by failing to comply with Rule 415(c). We reject this presumption. Indeed, "a defendant does not have a constitutional right to read discovery materials and an attorney's decision as to whether to provide his or her client with such materials is a matter of trial

strategy and is within counsel's discretion." *People v. Savage*, 361 Ill. App. 3d 750, 757 (2005); see *People v. Davison*, 292 Ill. App. 3d 981, 988-89 (1997) ("Trial counsel's decision whether to provide his client with discovery materials constitutes a matter of trial strategy and judgment that ultimately lies within counsel's discretion."). Defense counsel would not have been ineffective even if she had completely refused to allow defendant to review the discovery material. An ineffective assistance claim based on counsel's failure to provide discovery materials would have been meritless. Therefore, defense counsel's omission of that claim from the posttrial motion was not a deficiency in her strategy, tactics, or decision-making. Accordingly, we find defendant has not demonstrated an actual conflict of interest.

¶ 137                                    III. CONCLUSION

¶ 138          For the reasons stated, we affirm the trial court's judgment.

¶ 139          Affirmed.